THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ROBERT W. FIELDING, Appellant.

<table><tr><td>36</td><td>401</td></tr><tr><td>158a</td><td>542</td></tr></table>

*City of Brooklyn — indictment, under section 165 of the Penal Code, of a deputy commissioner of city works for certifying fraudulent bills — competency of evidence of the certification of previous bills by him — audit based upon such certification without other investigation — corroboration of the testimony of the person presenting the bill that he paid the defendant a percentage for similar "jobs."*

A deputy commissioner of city works of the former city of Brooklyn who certifies a bill for work done under a contract which was not preceded by advertisement for proposals nor executed and attested as provided by section 1 of title 18 of the charter of that city, and was part of a scheme to evade the $2,000 limitation of the charter (Laws of 1888, chap. 583), the bill being presented with intent to cheat and defraud said city, is indictable under section 165 of the Penal Code, whether or not, under the charter of said city, such deputy commissioner was authorized to certify such bill while the commissioner was neither absent nor physically disabled. As such deputy commissioner was a public officer, and in approving such bill acted either *virtute officii* or in the discharge of the duties of an " office or place of trust " within the meaning of that section, it cannot be said that such certification is not " a part" or a " taking part " in the audit and allowance of a claim against the city within the meaning of said section.

*Semble,* that where the deputy commissioner of city works, in pursuance of the regulations of the office or in the discharge of the duty incident to a place of trust, has made a certificate of approval which was part of the proof upon which the auditor acted in auditing a bill, he cannot be heard to plead want of authority to do so.

Upon the trial of such an indictment evidence of the defendant's transactions in certifying ten bills for the same work, which preceded the certification of the bill upon which the indictment was founded, is admissible to show the knowledge of the defendant that numerous bills for work actually done had already been certified by him for the purpose of having the same audited in the regular course of business.

Evidence by the auditor to the effect that when auditing the bill in question he made no other investigation than an examination of the bill itself, is admissible to show that the certification by the defendant was a part of the evidence upon which the audit was made.

Where, upon the trial of the indictment, the person who had presented the alleged fraudulent bill and thus became a party principal to the crime, testifies that it had been his custom to pay the defendant for previous " jobs " by opening the drawer of a desk in the defendant's office and depositing bills therein, his testimony may be corroborated by showing that he actually had received money from the city in the form of bills with which he might have made payment to the defendant in the manner stated.

How far evidence concerning the circumstances under which a former commissioner of city works gave out work is admissible, considered.

APPEAL by the defendant, Robert W. Fielding, from a judgment of the Supreme Court in favor of the plaintiff, rendered on the 26th day of May, 1898, upon the verdict of a jury, convicting him of the crime of conniving at the auditing and allowance of a frandulent claim against the city of Brooklyn, with intent to defraud.

*Charles J. Patterson*, for the appellant.

*Josiah T. Marean, District Attorney*, for the respondent.

GOODRICH, P. J.:

The indictment accuses the defendant of the crime of " conniving at the auditing and allowance of a fraudulent claim against the City of Brooklyn, with intent to defraud." It charges that the crime was committed on December 22, 1897, and at other times; that John R. Sutton was at the time auditor of the city and authorized to audit and allow for payment bills presented against the city; that the defendant then was a public officer, viz., deputy commissioner of city works; that a part of his duty was to take part in auditing and allowing claims and demands upon the city; that on December 22, 1897, with intent then and there to cheat and defraud the city, the defendant did " knowingly, willfully and feloniously consent to and connive at the auditing and allowance of a certain claim, bill and demand against the said corporation, the city of

Brooklyn, which was false and fraudulent, and which contained charges, items and claims which were false and fraudulent, and did endorse and sign on said bill his approval thereof, intending thereby to influence the said auditor to audit the same, and the same was thereafter audited for payment by said auditor."

A copy of the bill is set out in the indictment and reads as follows :

"GENERAL FUND.

"THE CITY OF BROOKLYN,

"*To* HENRY E. FINKLE,

"Residence, 407 Hamilton Ave., *Dr.*

"1897. For furnishing and distributing earth filling Dec. 16, on Neptune avenue, between West 12th and West 20th streets, over the water main, as per proposal, 1,528 cubic yards at $1.30 cu. yd. Total dollars, $1,986.40."

Attached to the bill is an affidavit of Finkle, dated December 16, 1897, that the services and articles had been performed and furnished, and that the prices charged were reasonable and just.

The indictment further charges that the bill had been, or was about to be presented to the auditor, as the defendant knew ; that it was false and fraudulent in setting forth that the city was, on December sixteenth, indebted to Finkle in such sum for such services and materials, whereas said services and materials had not been rendered and furnished, and the city was not so indebted, as the defendant well knew ; that said bill was for work pretended to have been done under a contract not limited in amount to $2,000, made by Finkle with the commissioner of city works, in behalf of the city, without the written consent of the mayor and without advertisement for proposals, as required by law, which contract was not reduced to writing nor executed by the mayor or commissioner, nor attested by the city clerk ; that it was not certified by the comptroller that a fund to meet the contract was provided ; and that payments had already been made on such contract, amounting to $19,726.20, all of which facts the defendant knew ; and that he also knew that by reason thereof the city was not indebted to Finkle in any sum whatever.

Upon this indictment the defendant was brought to trial at a criminal term of the Supreme Court ; the jury rendered a verdict of guilty of felony as charged in the indictment, and a judgment of

conviction was entered thereon, from which the defendant appeals.
The defendant was sentenced to be imprisoned for a term of two
and one-half years in the State prison at Sing Sing, and to pay a fine
of $2,171.60.

The indictment was found under section 165 of the Penal Code,
which provides as follows :

"*False auditing and paying claims.*— A public officer, or a per-
son holding or discharging the duties of any office or place of trust
under the State, or in any county, town, city or village, a part of
whose duties it is to audit, allow or pay, or take part in auditing, allow-
ing or paying, claims or demands upon the State or such county,
town, city or village, who knowingly audits, allows or pays, or
directly or indirectly consents to, or in any way connives at, the
auditing, allowance or payment of any claim or demand against the
State or such county, town, city or village, which is false or fraudulent,
or contains charges, items or claims which are false or fraudulent, is
guilty of felony, punishable by imprisonment for a term not exceed-
ing five years, or by a fine not exceeding five thousand dollars, or
by both."

During the years 1896 and 1897 John R. Sutton was auditor
of the city of Brooklyn, Theodore B. Willis, commissioner, and
the defendant deputy commissioner of city works. The charter
of the city of Brooklyn (Chap. 583, Laws of 1888), section 2 of
title 3, conferred upon the mayor the power to appoint certain
heads of departments, and among them the commissioner of city
works. The commissioner had the power to appoint a deputy, who
"shall, during the absence or inability of the head of the depart-
ment by whom he was appointed, have power to perform all the
ordinary duties of such head of department, except the power to
make appointments, subject, however, to such restrictions or regu-
lations as may be provided by the head of the department so
appointing him." There was evidence tending to show that the
defendant was charged by the commissioner with the general duty
of examining and approving or rejecting bills and claims on matters
arising in the department, whether the commissioner was absent or
otherwise unable to attend to them. And it appeared by the testi-
mony of the defendant that nearly all bills were examined and
passed upon by himself.

The duties of the auditor are defined in title 5, where it is provided as follows:

"SECTION 1. * * * It shall be his (the auditor's) duty to examine all bills presented against the city for payment. No claim against the city, including claims for local improvements, shall be paid unless he shall certify that the services have been rendered or the materials furnished for which such bills may be presented, and that the charges are just and reasonable, or according to contract.

"§ 2. All moneys drawn from the treasury shall be upon vouchers for the expenditure thereof, examined and allowed by the auditor, and also approved by the comptroller, in whose office all such vouchers shall be filed.

"§ 3. No bill or claim shall be audited unless the same be made out in items, certified by the head of the department or officer having cognizance of the subject of such claim.

"§ 4. He shall also have the right to require from the different officers all the information which they possess, and to inspect any book, contract, resolution or other paper or document in thei respective departments or offices, and it is hereby made the duty o.' all such departments and officers to furnish and permit the same when so required by him."

Title 4, section 1, which relates to the department of finance, provides that "no expenditures, debts or disbursements of the several departments or other officers shall be paid, except upon vouchers properly certified and audited, as provided by this act."

Title 3, section 11, subdivision 2, provides that the mayor "shall, jointly with the comptroller, sign all warrants, bonds and other obligations of the corporation. But he shall not sign any warrant or other obligation unless a proper voucher therefor shall have been first examined and certified to by him."

Title 18, section 3, provides that "no contract or agreement for any purpose, involving the payment of any money, shall be valid and binding against said city unless the comptroller shall certify or indorse on such contract or agreement that the means required to make the payments under such contract are provided and applicable thereto. * * *"

Title 18, section 1, as amended by chapter 329 of the Laws of 1895, provides as follows: "All contracts relating to the construc-

tion and maintenance of the water works exceeding in amount the sum of two thousand dollars   *   *   *   shall also be made by the commissioner of city works, after advertising for proposals for ten days in the corporation newspapers, and shall be awarded by him to the lowest bidder, provided, however, that with the written consent of the mayor, the said commissioner may receive proposals for any of such purposes without advertisement therefor, and with such consent may award the contracts to others than the lowest bidders, and all contracts so awarded shall be executed by the mayor and the commissioner of city works and attested by the city clerk."

There was evidence tending to show that by the ordinary course of business, claims arising in the department of city works were first certified by the head of the bureau having charge of the particular work, and passed to the commissioner of city works or his deputy, and when approved by him were forwarded to the auditor, who approved and forwarded them to the comptroller, who in turn sent them to the mayor, with a warrant of payment for the latter's signature.

Some years prior to 1896, the city had constructed a water main and a sewer in Neptune avenue. The main was twelve inches in diameter and had been laid on the surface of the earth along the line of the avenue, which was then laid out but not graded. The sewer was partly above and partly below ground and parallel with and about sixteen feet distant from the main. Originally, both main and sewer had been more or less covered with earth, showing two parallel ridges.

In November, 1896, the defendant, as deputy commissioner of city works, executed a contract in writing with Daniel Doody, as contractor, by which the latter agreed to cover the exposed portions of the twelve-inch water main of the city, between West Twelfth and Twentieth streets, a total length of 1,635 feet, said in the contract to require approximately 1,500 cubic yards of earth, the price to be $1.33 per cubic yard, and the whole amount to be expended under the contract not to exceed $2,000. The bill rendered under this contract was for 1,270 cubic yards and amounted to $1,689.10; it was approved by the defendant and paid in the usual course of business.

There was evidence tending to show the following facts: In the

fall of 1897 the covering of the main was in nearly the same condition as it was left in 1896, with some parts slightly exposed. Sometime in September or October, 1897, interviews occurred between Daniel Doody and the defendant Fielding. Doody testified substantially as follows : He had been doing several jobs of " invitation " work for the department and had paid Fielding ten per cent of the amount received by him from the city therefor ; he told Fielding that Oscar Knapp had informed him that the pipes on Neptune avenue needed to be covered, or were to be covered, and asked him if it was all right. Fielding replied that he would pass whatever Knapp recommended. Knapp was water purveyor and head of one of the six bureaus of the department and, as such, had charge of initiating proceedings for this kind of work. At a later interview, Doody told Fielding that it had been arranged that he was to have the work and wanted it in the name of Finkle, whose address he gave him. He also gave Fielding the names of four persons who were going to bid on the work, Haywood, Finkle, Frazier and O'Connor, all of whom he said represented himself. These persons were all connected in business with Doody, and he told Fielding that the same arrangement of ten per cent upon " invitation " work would be continued on this job.

On October 15, 1897, Knapp addressed a letter to Commissioner Willis, stating that the twelve-inch water main on Neptune avenue, from West Twelfth to West Twentieth streets, was in a condition requiring immediate attention; that the earth covering had been reduced by various causes ; that there was danger of injury to it by freezing or by fracture ; that the length to be filled in was about 1,600 feet, and that the work could be done at an expense not to exceed $1.35 per cubic yard. He recommended that bids be solicited and stated that it was a " matter of urgency." It will be observed that the letter called for filling over the water main alone. This letter was approved in writing by Fielding, who on the same day also caused to be entered on the records of the department an order that the water purveyor solicit bids for the work of covering the water main on Neptune avenue, from West Twelfth to West Twentieth street, and not for any other filling. On October sixteenth Knapp wrote to Frazier, and on October eighteenth to Finkle and Haywood, asking proposals for the work, to be sent

to the commissioner of city works, and on the eighteenth written
proposals to do the work were sent to the commissioner, by Finkle
at one dollar and thirty cents, by Haywood at one dollar and forty
cents, and by Frazier at one dollar and seventy cents per cubic yard.
There was an entry in the record directed by Fielding, stating the
receipt of the three proposals and the award of the contract to
Finkle; and there appear on Finkle's proposal the words:
"Approved October 19, 1897. R. W. Fielding, Deputy Commis-
sioner. R. W. F."

The work of filling was proceeded with and thereafter Finkle
presented eleven bills for work done under this contract, that is, for
furnishing and distributing earth over the water main, as shown on
the following schedule:

| Date (1897) | Cu. Yds. | Amount. | Approved (1897). |
|---|---|---|---|
| October   28........ | 1,497 | $1,946 10 | November   1 |
| November   3 ....... | 1,520 | 1,976 00 | November 24 |
| November 11........ | 1,517 | 1,972 10 | November 24 |
| November 19........ | 1,509 | 1,961 70 | December   6 |
| November 20...... .. | 1,508 | 1,960 40 | December 18 |
| November 23........ | 1,530 | 1,989 00 | December 21 |
| November 26........ | 1,529 | 1,987 70 | December 16 |
| December   4........ | 1,523 | 1,979 90 | December 18 |
| December   7........ | 1,519 | 1,974 70 | December 20 |
| December 14........ | 1,522 | 1,978 60 | December 22 |
| December 16........ | 1,528 | 1,986 40 | December 22 |
|  | 16,702 | $21,712 60 |  |

The bills were similar to the one set out in the indictment, and
on each of them was a memorandum in red ink, put on in the pur-
veyor's office: "From minutes, October 18, 1897." The only entry
on the record of that date, relating to the Finkle contract, is the
approval of Finkle's bid, already stated. The bills and indorse-
ments are similar, except as to variances of amounts and dates.
The following entries, indorsements or certificates also appear on
each of the bills: an affidavit of Finkle, that it is correct; "Exam-
ined by E. E.," or in place of, and in several cases in addition to, the
last, "Examined by O. K., F. Milne, Ass't Eng.;" certificate of

correctness, signed " Oscar Knapp, W. P. ; " " Approved (with date) R. W. Fielding, Deputy Commissioner."

The bills were sent to the auditor, who approved them in writing, and they were afterward audited by Sutton, as auditor, and paid by the city, the proceeds or some part of them coming into the possession of Doody, who testified that he paid Fielding ten per cent of the amount of each warrant, by opening the drawer of a desk in Fielding's office, at which Fielding was sitting, and putting the money therein while they were conversing together, no one else being in the office. On cross-examination, Doody stated that he paid to Fielding and others forty per cent of all moneys received on this and certain other former jobs.

There was no advertising for proposals, no consent by the mayor that proposals might be received without advertisement, no consent to award to other than the lowest bidder, and no written contract executed by the mayor and commissioner of city works and attested by the city clerk, as provided by section 1 of title 18 of the charter, above cited.

Evidence was also given by the prosecution tending to show that the entire length of Neptune avenue, between Twelfth and Twentieth streets, was about 1,600 feet, and that it would require only 1,600 cubic yards of earth to make a bank 3 feet high and 9 feet wide, amply sufficient to cover the entire main, even if there had been no previous covering or if the original covering had entirely disappeared; that the amount of earth named in the eleven bills was 16,702 cubic yards, which would be sufficient to make a bank 30 feet wide, 9 feet high and 1,600 feet long; that in April, 1896, the condition of the street was substantially the same as in December, 1897; that, while there were some broken places, five cubic yards would have been sufficient to cover all such places; that there were not, in April, 1898, 5,000 cubic yards in the whole embankment above the surface, including the water main and sewer and all earth which had been filled in the entire width of the avenue, either before 1896 or in 1896 and 1897; and that there was no tide wash or any considerable sinking of the filling below the natural surface of the meadow.

There was evidence on the part of the defendant that the amount

of material in the embankment was 13,955 cubic yards, and that, with an allowance of 5,500 yards for settlement, there would be about 8,500 yards; that engineers ordinarily allow one-eighth for settlement in material, without regard to subsidence of foundation, which in the present case might be between fifty and sixty per cent.

The court instructed the jury, among other things, that the prosecution was bound to prove that the claim mentioned in the indictment was false or fraudulent, and also that the defendant knew it at the time he approved the bill, and that if there was failure on either proposition, the defendant was entitled to an acquittal.

The defendant's counsel contends that section 165 of the Penal Code is "highly penal in its character and must receive a very strict construction." The learned counsel has evidently overlooked section 11 of the Penal Code, which says: "The rule that a penal statute is to be strictly construed does not apply to this code or any of the provisions thereof, but all such provisions must be construed according to the fair import of their terms, to promote justice and effect the objects of the law." With this provision in mind, I proceed to examine the arguments for reversal.

The first contention of the defendant's counsel is that the case does not fall within the provisions of section 165 of the Penal Code, above cited, as Fielding had no official authority effectively to audit or allow the bill in question or take any part in doing so. The difficulty with this position is that it is based upon the first part of section 165 and entirely ignores the other words, which cover the case of a "public officer, or a person holding or discharging the duties of any office or place of trust," who "directly or indirectly consents to, or in any way connives at the auditing, allowance or payment of any claim against the * * * city * * * which is false or fraudulent, or contains charges, items or claims which are false or fraudulent. * * *"

The auditor had no power to audit the bill unless it was "certified by the head of the department or officer having cognizance of the subject of such claim." (Laws of 1888, chap. 583, tit. 5, § 3.) This made it possible and justifiable for the auditor to take into consideration the certification of a proper officer as one of the grounds for auditing and allowing a bill presented to him.

It is evident from the language of section 1 of title 4 of the charter that certification of a bill by the proper department or officer is of the essence of the scheme of audit. This section provides that no expenditure shall be made except upon vouchers properly certified and audited. The certification must precede the audit, and the auditor is authorized to rely and act upon such certification. It is an integral part of the plan provided in the charter for the protection of the city from unjust and unfounded claims. It cannot be said that such certification is not " a part " or a " taking part " in the audit and allowance of a claim against the city.

The indictment charges the defendant with having consented to or connived at the auditing or allowance of the bill, and indorsed or signed his approval upon it, intending thereby to influence the auditor to audit the same. True it is that in the previous part of the indictment he was charged with taking part in the audit. It is not even necessary for us in this connection to decide whether the evidence is sufficient to convict the defendant of that crime. It is sufficient that there was evidence which justified a conviction for directly or indirectly consenting to or conniving at the auditing or allowing of a false or fraudulent claim against the city and approving such claim, or certifying to the bill, intending thereby to influence the auditor to audit the same.

The counsel for the defendant also insists that " the defendant was neither the head of a department nor an officer having cognizance of the subject of the claim in question." It is not entirely clear that the words, " officer having cognizance," refer at all to the deputy commissioner of city works, although they seem broad enough to cover the case. The defendant was the deputy commissioner, with power, during the absence or inability of the commissioner, to transact any ordinary duties of the commissioner, subject to such restrictions or regulations as the commissioner might provide. He was also " discharging the duties of any office or place of trust." There was evidence tending to show that the commissioner was not absent from his office on December twenty-second, the day on which the bill was approved by the defendant, but the power of the defendant to act may rest upon the inability of the commissioner, or upon the general regulations of the department, or upon the fact that the defendant was discharging the duties of the office.

The use of the two words, "absence" and "inability," indicates that the Legislature had in mind that something else than absence might prevent the head of the department from acting in all matters of business. Force must be given to both words. The Century Dictionary's primary definition of inability is, "The state of being unable, physically, mentally or morally; want of ability; lack of power, capacity, or means." Clearly, the inability referred to in the section is not confined to simple physical inability to examine the bill and sign the approval. It may depend upon the necessities growing out of such pressure of other official business as renders it impossible for the head of the department to attend to all the work of his office. This may be such as to compel him to confide to the deputy certain kinds or portions of the business. It was doubtless for this reason that the words "subject, however, to such restrictions and regulations" appear in the section. The clause is not necessarily to be interpreted as one of limitation of the power of the commissioner or of his deputy, for both words are in the sentence, "restriction and regulation." In other words, the commissioner can either restrict or regulate the exercise of the duties which he confers upon the deputy, and in the absence of any evidence that either was done, it must be assumed that the power of the deputy over business committed to him was untrammelled. It clearly appears that, by the regulations of the department, the constant practice of the defendant was to examine and approve such bills, and that in doing this he was discharging the duties of a place of trust. This appears by the numerous if not exclusive acts of the defendant in that respect, and indeed one of the excuses or reasons which he gave for his approval of the bill in question was that many hundreds of bills were presented to him for approval, and that by reason of the multitude of such bills which were presented during the closing term of his office, in December, 1897, he could give each bill only a casual and superficial examination, and that he was compelled to rely upon the certificate of the engineer, who was a subordinate in his department. It would seem to be a fair inference that, if he relied upon such certificate, he was bound to assume that the auditor also would rely upon his certificate of approval in making the audit.

Whether the defendant, as deputy commissioner, was, or was not,

authorized to approve the bill while the commissioner was neither absent nor physically disabled, makes no difference, as the defendant was a public officer and acted either *virtute officii* in approving the bill, or else he was discharging the duties of "any office or place of trust," as stated in section 165; and this brings him within the charge of the indictment.

In *People* v. *Bowe* (34 Hun, 528) there was an indictment against the warden or keeper of the jail in the county of New York for perjury in making oath to an account or statement as to the support of prisoners in the jail, upon which a payment was to be made by the county. The defense was made that the defendant had no legal authority to make the affidavit, but it was held that it was no defense for the defendant to show that he was not the proper person to verify the account so long as he did verify it. I think the analogy of this case and the one at bar is apparent. The defendant made a certificate of approval which was part of the proof upon which the auditor acted in auditing the bill, and the defendant cannot be heard to plead absence of authority, when, in pursuance of the regulations of the office or in the discharge of the duty of a place of trust, he approved the bill in question. The result of the defendant's approval was calculated to be and was influential in the audit of the bill, and the jury were justified in finding that his approval was a consenting to or conniving at such audit, or that the defendant certified the bill, intending thereby to influence the audit.

The next contention of the defendant is that the evidence was not sufficient to establish that the bill in question was fraudulent, or that the defendant knew it to be so. This brings us to a consideration of the evidence on that subject. The defendant in November, 1896, as deputy commissioner of city works, executed a written contract with Doody, whereby the latter agreed "to furnish and deliver all materials and furnish all appliances and labor, and to do everything necessary to fill around and cover over the twelve-inch (12 in.) water main on Neptune avenue, * * * as more particularly set forth in the following specifications which form part of this agreement, to wit: 1st. The work required is the covering of the exposed portions of the twelve-inch (12 in.) water main on Neptune avenue, from a point about two hundred (200) feet west of West 12th st., to the intersection of West 20th st., a

total length of about sixteen hundred and thirty-five (1635) feet, requiring approximately fifteen hundred (1500) cubic yards of earth." Here was a definite statement as to the length of the line and the amount of earth deemed necessary to fill around and cover the main. Unless the work could be done within the $2,000 limit the defendant had no power to make the contract without the consent of the mayor. The defendant cannot shelter himself by any plea of ignorance or forgetfulness of the contents of his contract and his approval of the bill therefor. It was a part of the records of the department. He executed it and must be presumed in so doing to have exercised that careful scrutiny which the law requires of all its public servants. It was not in October, 1897, an ancient transaction, and he must be held to a knowledge of the fact that the water main had been recently covered in pursuance of that contract, and of the amount of filling necessary for that purpose ; and yet, within one year, he approved a new contract for again doing work similarly described and identified.

Let us assume, however, that under any circumstances he was justified in approving, in October, 1897, the bid of Doody for the re-covering of the main, or that by some sudden emergency he believed that it had become necessary to re-cover it. The indictment does not charge fraud in respect of the defendant's approval of the first bill under the contract. But when the first bill was presented to the defendant for approval it contained the statement that it was "for furnishing and distributing earth filling * * * over the water main, as per proposal, 1,528 cubic yards." This proposal was made in pursuance of a letter from Knapp, the water purveyor, which called for proposals "for covering water main on Neptune avenue, between West 12th and West 20th Sts." The defendant knew or was bound to know that, under the charter, he could not enter into a contract which required the expenditure of more than $2,000, without advertising for bids or obtaining the consent of the mayor therefor. He assumed to act under the emergency provision of the charter in approving the proposal of Finkle. If such action had ended the transaction it would have been possible to believe that he had simply been over-anxious under the menace of some sudden injury to the main arising from its exposed condition, but we find that after the bill for this work was approved by

him on November first, without any new proposals, or approval of any new proposals, he certified two other separate bids, each for substantially the same amount and for the same work on November twenty-fourth. These were followed by another bill and approval on December sixth, another on December sixteenth, by two more on December eighteenth, by another on December twentieth, another on December twenty-first, and, finally, by two more on December twenty-second, one of which last two is the eleventh bill in the schedule already given, and the one upon which the indictment rests. Each of the bills specified that it was for "furnishing earth filling and distributing the same over the water main," not for general filling or distributing over the sewer, or over any part of the avenue other than the water main, while the amount of earth in each and every bill was more than sufficient to cover the main if it had been newly laid and entirely bare.

"A defendant in a criminal action is presumed to be innocent until the contrary be proved" (Code Crim. Proc. § 389), but it would tax the imagination of the most credulous person in the world to believe that the defendant did not know that fraud was stalking rampant through his department when, in close proximity, repeated bills, calling for nearly ten times the amount of work and compensation named in the original proposal, were presented to, and approved by, him within a period of fifty-two days, and in some instances two of them on the same day. The defendant must have known that he was repeating certification of bills for the identical work which he had already certified, and especially is this true of the work for which the last bill was certified. Certainly, this is true as to the tenth bill, which he approved on the same day that he approved the eleventh, and still more is it evident as to the eleventh. The whole scheme was a manifest and repeated evasion of the $2,000 limitation of the charter, and it is very clear that upon the evidence the jury were justified in finding that the bill was fraudulent and that the defendant had such guilty knowledge as to the fraudulent character of the bill set out in the indictment as is essential to his conviction.

After a careful reading of the evidence, even excluding the testimony of Daniel Doody, it is impossible to reach any other conclusion than that the defendant formed a deliberate scheme to evade

the $2,000 contract limitation of the charter, so that he could give out the contract to selected bidders without public advertisement, and that for this purpose he arranged a plan by which he should approve a contract on its face calling for a sum within the limit, and make this single contract a basis for numerous bills, all for similar work and amount, which were to be rendered from time to time during the short remainder of his official life, or just as long as the matter could be conducted secretly and without public or official scrutiny.

It was also proper for the court to admit evidence of all the defendant's transactions in certifying the ten bills which preceded the certification of the bill of December twenty-second, in order to show the knowledge of the defendant that numerous bills for work, which had been actually or properly done upon the main, had been already certified by him for the purpose of having the same audited in the regular course of business.

The defendant's counsel urges with great earnestness that it was error to admit the testimony of Mr. Sutton, the auditor, that he made no other investigation than an examination of the bill itself. This is based upon a question addressed to Sutton : " Q. In auditing this bill, did you make any other investigation than the inspection of the bill itself as it came to you ? [Objected to as immaterial, irrelevant and incompetent, on the ground that what he did that was not with defendant's knowledge or at defendant's direction, and which intervened after we had performed our services with regard to the bill, could not retroact so as to affect the character of our act in having approved this bill.]" After some inquiries by the court, the witness answered : "I audited this bill in good faith. In the honest discharge of my duty, believing that it was a proper claim against the city to be allowed. I exercised my judgment on it; it was my duty to do so; I know from the face of the bill itself that it was incurred under the authority of an entry on the minutes of the City Works Department. From the minutes of October 18th, 1897, I knew that no written contract had been entered into for that work. I knew that no written contract had been filed in the Comptroller's office and certified by the Comptroller. It was the practice of the Department of City Works to certify these bills for less than $2,000 where no written contract had been entered into."

Even if the question called for immaterial, irrelevant or incompetent evidence, the answer, which does not seem to have been a direct answer to the question, was admissible to show that the certification by the defendant was a part of the evidence upon which the audit was made, and this reaches the very gravamen of the indictment. It was competent to show that the defendant took part in the proceedings upon which the audit was made, or thereby connived at the audit of the bill. ·

Another exception to the admission of evidence requires consideration. This relates to evidence of the receipt of money by Doody from the city, both upon the Finkle bills and other bills on previous jobs. Doody testified that he paid the defendant ten per cent of the amount *received by him on previous work*, and had said to him that " the same arrangement would go along as we had been doing, the same arrangement would be carried out." He testified, without objection, that he had paid Fielding ten per cent of the amount *received by him from the city on a previous job*, for New Utrecht avenue. When the prosecution attempted to prove a similar state of facts on another previous job, for Wartman avenue, the defendant's counsel objected. We do not see, however, that the admission of the evidence as to Wartman avenue, or as to the Finkle bills, could materially injure the defendant, as one similar instance had already been proved without exception.

We must not lose sight of the fact that Doody was *particeps criminis* and that his testimony was open to suspicion, and the jury might believe or disregard it altogether. There were some circumstances as to which he testified which were subject to contradiction if untruly stated, but they were not denied. Doody testifies : " On each warrant I paid the sum of ten per cent to Mr. Fielding ; it might be a little over. * * * I could not name the specific sum in each case ; never gave any odd cents, always even money. * * * I did the paying myself in Fielding's office, in cash. * * * I mean in bills. The payments were made by opening the desk that was right in front — a roll top desk, opening the drawer of the desk and putting it in the drawer, right in front of him, directly in front. He was at the time sitting down alongside the desk. The drawer was not open. I opened it and put the money

in and closed it. Sometimes conversing with him. There was never any one else in the office besides myself." He also testified that during 1896 and 1897 he paid Fielding more than $12,000; that the payment on the first ten warrants was about $2,000, approximating ten per cent on the amount of those bills. The defendant, indeed, denied the story, but did so in a somewhat limited manner. His testimony on the matter is as follows: "Witness: I don't know whether these men had been bidders before or not. I never had any transaction with Daniel Doody in which he paid me ten per cent. upon any money he had received out of any public contract. I never had any talk with Daniel Doody about receiving ten per cent. on invitation work or any work in which he was engaged. Q. He says he came and put bills in a drawer in a desk where you were sitting, and went away and left them there. Did ever any such transaction take place? A. Not to my knowledge. Witness: I never saw him do it. I never got any money out of any drawer. I never had any arrangement or conversation or understanding, direct or indirect, either with Daniel Doody or any other person, that I should get any money out of any public work that went through the department."

There can be no question that Doody, on his own evidence, was a party principal in the crime with which the defendant was charged. Section 29 of the Penal Code reads: "A person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a principal."

Section 399 of the Code of Criminal Procedure reads: "A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime."

It was, therefore, material and proper to corroborate the testimony of Doody by showing that he actually had money, and that in bills, to make the payment to Fielding in the method in which he stated. Under these circumstances I think the admission of the testimony as to the receipt of money from the city by Doody worked no injury to the defendant and is not reversible error.

The defendant offered evidence to show that under the previous commissioner of city works the practice had existed to give out work, without advertisement for bids, when the aggregate cost exceeded $2,000 and then make out bills under $2,000, but in all aggregating a larger amount. It was stated by defendant's counsel that the evidence was offered to corroborate the testimony of Fielding that he had heard of such practice. The court said: "I will let you corroborate that he heard it; that this witness told him. I think so far as regards the guilt, the criminal knowledge, that it bears upon the case, whether he was so informed or not." The court properly excluded the fact as to the circumstances under which a former commissioner gave out work, but the defendant did not avail himself of the permission to prove *aliunde* the defendant's knowledge or information as to the existence of such practice.

The record contains ample evidence that the defendant, with Daniel Doody, concocted and carried out a brazen scheme to defraud the city; that he was cognizant of all that was being done in pursuance of the plan; that he assisted it in all its stages; that for his own benefit and profit he basely betrayed the public trust reposed in him. And his conviction is a righteous retribution and a vindication of our judicial system for the discovery and punishment of unfaithful officials.

We find nothing in the record to justify the charge that the district attorney exceeded his duty, either in his opening or his closing address to the jury. Impartially, both to the People and to the defendant, he presented to the jury the facts shown by the evidence. His conduct not only calls for no disapproval from this court, but meets with our cordial approbation.

The judgment and conviction must be affirmed.

All concurred in result.

Judgment affirmed.